UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                            Case No. _____

WECARE PHARMACY, LLC;         FILED *EX PARTE*
QINGPING ZHANG, PHARMD, MS;   AND UNDER SEAL
LI YANG, L&Y HOLDINGS, LLC.

    Defendants.

_____/

## DECLARATION OF TRACEY J. SCHOSSOW, PHARM D.

I, Tracey J. Schossow, declare under penalty of perjury that the following statements are true and correct:

### Professional and Academic Experience

1. The opinions in this declaration are based on my experience of 12-years in retail pharmacy, including managerial roles, two years as a Clinical Mail Order Pharmacist, six years as a Clinical Pharmacy Specialist with the Veterans Health Administration, six years as a Clinical Hospice Pharmacist specializing in comfort and pain management.

2. I am currently employed as a Medication Therapy Management

1

Specialty Pharmacist by Blue Cross Blue Shield of Florida through Florida Blue.

3. My licensure includes a clear and active Florida Registered Pharmacist license, valid since 1994. I am also licensed as a Florida Consultant Pharmacist.

4. My qualifications, with additional relevant details, are presented in my curriculum vitae accompanying this report.

**Materials Reviewed**

5. I was asked by the U.S. Department of Justice to review the dispensing of controlled substances by WeCare Pharmacy based on prescription drug monitoring program ("PDMP") data from 2016 through January 2021, to evaluate whether the pharmacists filling prescriptions for controlled substances at the pharmacy were appropriately exercising their corresponding responsibility to ensure the medical legitimacy of the prescriptions dispensed and dispensing controlled substances in the usual course of professional pharmacy practice.

6. Specifically, I was asked whether certain red flags presented in the dispensing of controlled substances by WeCare Pharmacy could have been resolved or whether certain red flags were unresolvable.

**Responsibilities For Pharmacists Dispensing Controlled Substances**

7. When dispensing controlled substances in schedule II-IV in the state of Florida, a pharmacy must first determine, exercising independent professional

judgment, that the prescription is valid. Fla Stat. § 893.04(2)(a). Florida law requires that pharmacists interpret and act on clinical data, perform therapeutic interventions when necessary. Fla Admin. Code § 64B16-27.8.

8. Pharmacists in the state of Florida must conduct a prospective drug use review of each new and refill prescription. Fla Admin. Code § 64B16-27.810. This includes identifying (a) Over-utilization or under-utilization; (b) therapeutic duplication; (c) drug-disease contraindications; (d) drug-drug interactions; (d) Incorrect drug dosage or duration of drug treatment; (e) drug-allergy interactions; (f) clinical abuse/misuse. Upon recognizing any of these items, the rule requires that a "pharmacist shall take appropriate steps to avoid or resolve the potential problems which shall, if necessary, include consultation with the prescriber." *Id.*

9. Rule 64B16-27.831 requires that a pharmacist exercise sound professional judgment in determining the legitimacy of a controlled substance prescription. "[W]hen a pharmacist is presented with a prescription for a controlled substance, the pharmacist shall attempt to determine the validity of the prescription and shall attempt to resolve any concerns about the validity of the prescription by exercising his or her independent professional judgment." Fla Admin. Code § 64B16-27.831(2).

10. When validating a prescription, if at any time the pharmacist determines that in his or her professional judgment, concerns with the validity of

the prescription cannot be resolved, the pharmacist shall refuse to fill or dispense the prescription. Fla Admin. Code § 64B16-27.831(2)(c).

11. The standard of care also requires compliance with 21 C.F.R. § 1306.04, which imposes a corresponding responsibility on ever pharmacist to ensure that a prescription for a controlled substance was issued for a legitimate medical purpose in the usual course of the prescriber's professional medical practice.

12. Thus, the standard of care for the practice of pharmacy requires that pharmacists recognize certain signs of an illegitimate prescription, drug diversion, or abuse, commonly known as "red flags." When a reasonable pharmacist, exercising professional judgment, cannot resolve the red flags, a pharmacist must refuse to fill a prescription. The prescriber, the patient, or the prescription may present a red flag.

13. My opinion is based on the procedures every reasonable pharmacist in the state of Florida would follow and is not specific to the standard of care utilized in my own clinical practice or experience.

14. The following tasks are normal standards of practice for any reasonable pharmacist practicing in the normal scope of pharmacy practice (based on the above listed facts via the Federal Laws, State Laws, CDC Guidelines, Pharmacist Oath, Common Red Flags for Diversion, and pharmacy knowledge

4

(learned obtaining a pharmacy degree). The pharmacist may use all or a combination of the following to assure therapeutic appropriateness, the prescription is valid for a legitimate medical purpose, take appropriate steps to resolve potential problems for every prescription, and record and maintain comments relevant to the individual's drug therapy. Not all red flags are resolvable.

    a. Check each prescription, patient computer-based pharmacy records, and E-FORSCE for therapeutic duplications, drug interactions, overutilization, clinical abuse/misuse, etc. and record comments relevant to the individual's drug therapy.

    b. Observe any patrons receiving large quantities of "Cocktail Medications (will expand meaning on next section) (6)" in one pharmacy visit or history thereof by observation of the pharmacy database and E-FORSCE to constitute $\geq$50mg oral morphine equivalents per day, $\geq$ 7-days of immediate-released opioids, or other "Red Flags" to assure the safety of the patron and the community.

        i. Check the pharmacy computer database for any pharmacist documented notes given by the physician, patron and/or caregiver regarding prescriptions for the patron that would clear any "Red Flags" for use.

      ii. Converse with the patron, patron's representative and/or physician for additional information for possible resolution of "Red Flags" to assure the prescriptions are for a legitimate medical purpose.

      iii. Ensure a reasonable effort is made to provide adequate documentation on the hard-copied prescription itself and/or in the pharmacy database to reference any clarification or any information to clear any "Red Flags" for diversion previously mentioned in this report.

  c. Distance Traveled: Detect the distance traveled by the patron and investigate reason for long-distance travel since these medications suppress the central nervous system to result in excessive drowsiness, dizziness and response time (interpreting and acting on clinical data of the medication is from 465.016) that can lead to harm of the individual and/or members of the community if attempting to operating a motorized vehicle.

  d. Pharmacy or Physician Shopping/Hopping: Inspect the pharmacy database and E-FORCSE for pharmacy/physician shopping for multiple "Cocktail Medications" for commonly diverted medications (1, 2, 3).

e. Stock Piling or Early Refills: Observe the pharmacy database and/or E-FORSCE for early refilling of commonly sought after "Cocktail Medications" to result in stockpiling of medication (1,3).

f. Groups: Recognize patrons with the same last name or different names, seeing the same physician, and/or living at the same address/area obtaining the same/similar "Cocktail Medications."

g. Pattern Prescribing/Rubber Stamping: Observe physicians writing for the same or similar sought after "Cocktail medication/s" month-after-month.

h. Physician Evaluation: Observe the physicians of scope/specialty of practice, disciplinary actions, or validity of license via the Florida Department of Health Website and/or repetitive known physicians in the pharmacy community that seem to write for "Cocktail Medications."

i. Method of Payment: Note if the patron is paying cash for their commonly sought after controlled substance prescriptions.

15. Assure the prescription/s are considered facially valid and meet applicable state and federal legal requirements, such as containing information required under 21 C.F.R. § 1306.05 and in compliance with physical security features regarding paper type, water mark, and so forth.

## Opinions Regarding WeCare Pharmacy

16. After reviewing the PDMP for WeCare Pharmacy, I have identified several "red flags" that reflect circumstances that cannot be resolved and under which no reasonable pharmacist, discharging their professional duties, would dispense controlled substances. These unresolvable red flags are obvious to any reasonable pharmacist and center on WeCare's systematic dispensing of prescriptions issued by the same prescriber for the exact same dosage of maximum dosage strength and high quantity of oxycodone and hydromorphone, two powerful opioids that are commonly abused; the systematic filling of these prescriptions for individual traveling long distances around the greater Tampa area and beyond to obtain these prescriptions; and the systematic reporting to the PDMP of a single rural address for a single family dwelling for multiple receiving these prescriptions. Taken together, these circumstances reflect egregious and dangerous dispensing practices by WeCare pharmacy in dispensing powerful narcotics despite the obvious, unresolvable red flags indicating that these prescriptions are not issued for a legitimate medical purpose.

17. **Rubber Stamping of Pattern Prescribing Is A Red Flag**. Based on the PDMP data I reviewed, WeCare Pharmacy has demonstrated shocking and egregious dispensing of controlled substances for a single practitioner, Prescriber 1, overwhelmingly prescribing either 90 oxycodone 30 mg tablet or 120

hydromorphone 8 mg tablets uniformly to patients. Oxycodone 30 mg is the highest strength form of oxycodone immediate release formulation and is among the most commonly abused prescription opioids. Similarly, hydromorphone is an exceptionally powerful opioid and the 8 mg tablet formulation is the highest generally available form of this drug, which is also a commonly abused prescription opioid.

18. The issuing of numerous opioid prescriptions by a single prescriber is a red flag, known to any reasonable pharmacist. When a prescriber issues numerous, similar opioid prescriptions, this is an obvious red flag of abuse or diversion and a strong indicator that the prescriptions presented were not issued for a legitimate medical purpose because it reflects a lack of individualized care. In the normal course of practicing pharmacy, any reasonable pharmacist would have almost immediately identified this significant red flag and refused to fill additional prescriptions from Prescriber 1.

19. During 2019 and 2020, Prescriber 1 issued approximately 988 prescriptions for oxycodone 30 mg tablets to be filled at WeCare. Based on these purported prescriptions, every single oxycodone 30 mg prescription was dispensed by WeCare for 90 tablets, except for a handful of prescriptions dispensed for 89 or 88 tablets.

20. During 2019 and 2020, Prescriber 1 issued approximately 630

9

prescriptions for hydromorphone 8mg to be filled at WeCare Pharmacy. Based on these purported prescriptions, with only five exceptions, every hydrocodone 8 mg prescription was dispensed by WeCare for 120 tablets.

21.     WeCare's rubber stamping of pattern prescriptions issued by Prescriber 1 is reflected in groups of individuals showing up in the pharmacy on the same days month after month for the same prescriptions for either 120 hydromorphone 8 mg or 90 oxycodone 30 mg. This is an obvious red flags that any reasonable pharmacist would have recognized.

22.     According to PDMP records, on January 5, 2021, WeCare pharmacy filled 13 controlled substance prescriptions. Prescriber 1 issued eleven of these prescriptions and ten were prescriptions for either 120 hydromorphone 8 mg tablets or 90 oxycodone 30 mg tablets. The very next day, on January 6, 2021, an additional six individuals presented prescriptions from Prescriber 1; half for 90 oxycodone 30 mg and the other half for 120 hydromorphone 8 mg. This is an obvious red flag that WeCare should have recognized.

23.     According to the PDMP data that I reviewed, WeCare's conduct in rubber stamping pattern prescriptions goes back 2016. For example, during the month of December 2020, 52 of 56 prescriptions issued by Prescriber 1 filled at WeCare were for oxycodone 30mg or hydromorphone 8mg. In November 2020, 46 of 50 prescriptions; October 53 of 57; September 56 of 62. This practice of

WeCare repeatedly filling these pattern prescriptions is an egregious example of rubber stamping and is an unresolvable red flag or circumstance in which no pharmacy, exercising the minimum standard of care, would dispense controlled substances.

24. WeCare's pattern of rubber stamping is further reflected in the fact that several of the very same individuals presented the same oxycodone 30 mg prescriptions or hydromorphone 8 mg prescriptions from Prescriber 1 on the same days in sequential months. For example, in October, November, and December of 2020: D.L., M.O., B.S, and T.S. all presented prescriptions at WeCare issued by Prescriber 1 for either Oxycodone 30 mg or Hydromorphone 8 mg on the same day of each month. This pattern of the pharmacy filling the same prescriptions for the same groups of individuals month after month reflects WeCare's overall rubber stamping, but raises an independent unresolvable red flag. When the same individuals present the same pattern prescriptions on the same day each month for several months, a pharmacy knows or should know that the prescriptions are not for a legitimate medical purpose because they are for high-alert, commonly abused drugs, in their highest available formulation, in the exact same high quantities, that there is no individualized care and the prescriptions must be declined.

25. WeCare repeatedly filled on the same day multiple pattern

11

prescriptions issued by Prescriber 1. For example, on each of the following dates, WeCare filled large numbers of prescriptions from Prescriber 1 for 90 oxycodone 30 mg or 120 hydromorphone 8mg tablets on the same day:

  a. 10/22/2018: 13 customers
  b. 12/17/2018: 12 customers
  c. 07/29/2019: 18 customers
  d. 09/23/2019: 12 customers
  e. 02/05/2020: 11 customers
  f. 06/30/2020: 11 customers
  g. 01/05/2021: 10 customers

When large groups of individuals present the essentially the same prescription from a single prescriber on the same day for the highest strength formulation of powerful opioids, it is an unresolvable red flag or circumstance in which no pharmacy, exercising the minimum standard of care, would dispense controlled substances.

26. **Individuals Traveling Long Distances to Obtain Opioids Is A Red Flag.** It is a red flag of abuse or diversion when individuals travel long distances to obtain opioid prescriptions or fill those prescriptions. Because most individuals see physicians near their home or place of employment, or otherwise proximally convenient. Traveling long distances to fill a prescription is a particularly

significant red flag when individuals pass by numerous alternative pharmacies where any legitimate prescription could be filled. Often, individuals are willing to travel long distances to fill prescriptions at a far-away pharmacy because other pharmacies closer to the individuals would decline a suspicious prescription. Like other red flags, traveling long distances may be a resolvable circumstance where, for example, a person may works far from their home and sees a doctor or fills a prescription near their workplace; a person may travel a long distance to see a practitioner with a recognized specialty; or other reasons. However, when multiple red flags are present, the standard of care for the practice of pharmacy requires that a pharmacist, acting as a gatekeeper of controlled substances, exercise sound professional judgment in evaluating and potentially resolving red flags.

27. WeCare filled prescriptions for multiple individuals receiving prescriptions from Prescriber 1 for oxycodone 30 mg or hydromorphone 8 mg who were also traveling long distances according to PDMP reports indicating an individual's address.

   a. P.M. traveled from her home in Ocala to Tampa to obtain prescriptions from Prescriber 1 and fill them at WeCare. This means that P.M. traveled more than 90 miles one-way from her home to the pharmacy, or approximately three hours driving time round trip.

b. T.J. traveled from his home in Ocala to Tampa to obtain prescriptions from Prescriber 1 and fill them at WeCare. This means that T.J. traveled more than 100 miles one-way from his home to the pharmacy, or more than three hours driving time round trip.

c. R.S. traveled from his home in Fanning Springs to Tampa to obtain prescriptions from Prescriber 1 and fill them at WeCare. This means that R.S. traveled approximately 120 miles one-way from his home to the pharmacy, or more than four hours driving time round trip.

d. L.L. traveled from her home in Sarasota to Tampa to obtain prescriptions from Prescriber 1 and fill them at WeCare. This means that L.L. traveled more than 60 miles one-way from her home to the pharmacy, traveling across two bridges, or more than two and a half hours driving round trip, or an even longer route to avoid the toll bridges.

e. V.H. traveled from her home in Lehigh Acres, outside of Fort Myers, to Tampa to obtain prescriptions from Prescriber 1 and fill them at WeCare. This means that V.H. traveled approximately 145 miles one-way from her home to WeCare, or more than four hours driving round trip.

f. J.N traveled from his home in Port Orange to Tampa to obtain

prescriptions from Prescriber 1 and fill them at WeCare. This means that J.N. traveled more than 150 miles one-way from his home to WeCare, or approximately five hours driving round trip.

28. **Multiple Individuals Sharing A Common Address Is A Red Flag.** Multiple individuals sharing a common address, particularly when they are receiving controlled substances from a single prescriber, is a circumstance that pharmacists know or should know is a red flag of abuse or diversion. DEA regulations in 21 C.F.R. § 1306.05 require that a prescription contain the patient's address. A pharmacy is required to document a patient's address in their records and report this information to the PDMP. A patient's address, as described above, and raise a red flag based on the distance a person travels. When multiple individuals share a common address and are receiving substantially similar prescriptions from the same prescriber, it is a significant red flag of abuse or diversion because it may indicate a lack of individualized care. Worse, sometimes a common address shared by multiple individuals may reflect a circumstance where an address given conceals a great distance traveled, or fictitious identities used to obtain drugs, or other attempts made by a prescriber or individual to conceal indications of abuse or diversion by furnishing a more plausible address so as not to raise red flags at a pharmacy or arouse suspicions by professional board inspectors or law enforcement personnel.

29. According to the data WeCare reported to PDMP, there are several instances where WeCare dispensed opioids to individuals sharing a common address.

   a. **North Church Avenue.** From 2016 through the present, WeCare filled opioid prescriptions from Prescriber 1 for six different individuals listed as having the same address on North Church Avenue in Tampa. Each of these individuals received opioid prescriptions from Prescriber 1 during this time period. In combination with the other red flags discussed above, this raises unresolvable red flags or circumstances in which no reasonable pharmacist would fill a controlled substance prescription.

   b. **North Armenia Avenue.** From 2017 through the present, WeCare filled opioid prescriptions from Prescriber 1 for three individuals listed as having the same address on North Armenia Avenue in Tampa. Each of these individuals received opioid prescriptions from Prescriber 1 during this time period. In combination with the other red flags discussed above, this raises unresolvable red flags or circumstances in which no reasonable pharmacist would fill a controlled substance prescription.

   c. **Round Lake Court.** From 2016 through the present, three different

individuals were listed by WeCare as having an address at Round Lake Court. Each of these individuals received opioid prescriptions from Prescriber 1 during this time period. In combination with the other red flags discussed above, this is an unresolvable red flag presenting circumstances in which no reasonable pharmacist would fill a controlled substance prescriptions. Based on a query of Google Maps street view, this address appears to be a single family home.

30. In summary, my review of WeCare Pharmacy's dispensing activity based on PDMP reports, as identified above, shows egregious and unresolvable various red flags that were consistently presented. There is an alarming pattern of dispensing dangerous quantities of controlled substances for extended periods of time under circumstances which would be clear to any reasonable pharmacist that the drugs were not being dispensed pursuant to a legitimate medical purpose.

31. A pharmacist dispensing controlled substances plays an important role as a gatekeeper for dangerous, addictive drugs. Pharmacists are aware of their role as important health care providers amidst the nation's opioid epidemic. When a pharmacist ignores circumstances that controlled substances are not prescribed for a legitimate medical purpose and nevertheless dispenses dangerous drugs, they put their customers and the community at great risk of drug abuse, addiction, and drug overdose.

32. Drug addiction can permanently alter the human brain, causing reduced function in the brain's ability to exercise judgment, make decisions, control impulses and regulate emotion. These alterations in brain function are part of why crime, social dysfunction, and accidental overdose and death are intertwined with drug addiction.

33. In my professional opinion, not only did WeCare Pharmacy fail to follow the standard of care in the state of Florida, but it also failed the corresponding responsibility under Title 21 C.F.R., Section 1306.04(a). With all the "red flags" presented, I believe that the pharmacists at WeCare knew or should have known that the controlled substances were being misused, abused or not prescribed for legitimate medical reasons and the circumstances were so alarming that no reasonable explanation could resolve the red flags and the prescriptions should never have been filled. By selling so many powerful oxycodone and hydrocodone prescriptions, WeCare placed its customers and the community at great risk of drug addiction and drug overdose.

Executed on 01/25/2021.

*Tracey J. Schossow*
Tracey J. Schossow, Pharm D.